[Cite as *State v. Williams*, 2024-Ohio-5164.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2024-T-0007 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| KASHAUN ROBIN WILLIAMS a.k.a. ROBIN KASHAUN WILLIAMS, | Trial Court No. 2023 CR 00216 |
| Defendant-Appellant. | |

**O P I N I O N**

Decided: October 28, 2024
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Ryan J. Sanders*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Michael A. Partlow*, P.O. Box 1562, Stow, OH 44224 (For Defendant-Appellant).

EUGENE A. LUCCI, P.J.

{¶1} Appellant, Kashaun Robin Williams ("Williams"), appeals the judgment of the Trumbull County Court of Common Pleas, after a trial by jury, convicting him of Aggravated Murder, Attempted Murder, Kidnapping, Aggravated Burglary, Receiving Stolen Property, Having Weapons Under Disability, and Assault on a Peace Officer (along with various associated specifications). For the reasons discussed in this opinion, the judgment is affirmed.

## I. General Background

{¶2}   In April 2023, the murder victim, J.C., and his girlfriend, M.M., the attempted-murder victim, lived together with J.C.'s dogs at 690 Lerner, Warren, Trumbull County, Ohio. At the time of the incidents, J.C. and Williams, whose nickname is "Rudy," were friends and had known each other for many years. Indeed, Williams referred to J.C. as "Big bro." Williams had been to J.C.'s residence on many occasions and was well acquainted with M.M. as well.

{¶3}   On April 1, 2023, J.C. invited his mother, Lasonya Lynk ("Ms. Lynk"), and his two sisters to stay at his home because his family had lost power at their residence in Liberty, Ohio, due to a storm. J.C. took his family to dinner and then drove his mother and sisters back to his house. Ms. Lynk and her daughters watched television and eventually fell asleep on J.C.'s couch.

{¶4}   Earlier on the day of April 1, M.M. attended a party where Williams was present. Later that evening, M.M. went to a local bar.  J.C., after taking his family to dinner, met M.M. at the bar. The couple later went to a different bar after which they left in separate vehicles. J.C. returned to the residence, and M.M. went to a local Sheetz store to get gas. At the gas station, M.M. saw Williams with his girlfriend, Amoria. While M.M. was waiting to pay for gas, she noticed that Williams was maced by Amoria. Police arrived to address the matter. Once police officers moved their cruisers, M.M. returned to the house on Lerner.

{¶5}   At the Lerner residence, J.C. assisted his mother and youngest sister, a 16-year-old girl ("A.L."), into the guest bedroom. J.C.'s older sister, J.M., a 21-year-old woman, slept on the living room couch. Both J.C. and M.M. then went to bed.

2

## II. The State's Theory of the Case

**{¶6}** Later, in the early morning hours of April 2, 2023, Ms. Lynk and J.C.'s younger sister, A.L., were awakened by a disturbance outside the home. The guest bedroom in which they were sleeping was adjacent to the home's driveway. Ms. Lynk heard a male's voice clearly shouting "J-Bae, Jae Bae," which was J.C.'s nickname.

**{¶7}** The voice continued, stating "J-Bae, Jae Bae, come outside, mother fucker. I'm gonna shoot these dogs. I'm gonna shoot these cars. This my shit. I run this." Ms. Lynk then heard two gun shots. The gunfire sounded as though it was "right outside the window." Ms. Lynk called to J.C. from the guest bedroom and alerted him that someone was outside.

**{¶8}** J.C. and M.M. awoke. J.C. put on black socks and a T-shirt. The T-shirt was on backwards. According to Ms. Lynk, J.C. was not "angry or argumentative" as he went to investigate the disturbance. J.C. went outside with M.M.  When they exited the home, Ms. Lynk overheard J.C. say, "Dog, what is you doing? My mom and my sisters is in here."

**{¶9}** Ms. Lynk could overhear fragments of a conversation; in particular, she heard J.C. question, "But what this got to do with me?" She then heard the other male, identified as Williams, state, "But I love you though, J-Bae." Ms. Lynk thought any conflict had de-escalated, but then overheard the male voice declare, "Mother fucker, I beat your ass."  She then heard J.C. respond, "Man, do whatever you gonna do." Ms. Lynk then heard two additional gunshots.

**{¶10}** Meanwhile, J.M., J.C.'s older sister, had retreated into the guest bedroom with Ms. Lynk and A.L. Ms. Lynk, A.L., and J.M. hid in the bedroom closet. J.M. confirmed

3

the substance of the conversation Ms. Lynk had overheard outside, including the two initial gunshots.

{¶11} Specifically, J.M. heard a male's voice, identified as Williams, stating "J-Bae, J-Bae," in almost "a singing" intonation. The voice kept announcing "We need to talk . . . N . . . .r you better come outside. I'm gonna shoot these dogs . . . I'm gonna shoot through all these cars." J.M. heard Williams declare "I love you, though, J-Bae." She then heard J.C. state, "What that got to do with anything though?" J.M. asserted J.C. sounded confused.

{¶12} According to J.M., M.M. entered the guest bedroom and explained Williams was "mad 'cause his girlfriend got maced at the gas station or something.'" A second round of gunshots were heard and M.M. left the room while J.M. called 911.

{¶13} J.M. stated M.M. subsequently returned to the bedroom and exclaimed, "Mama, he shot [J.C.]." M.M. again left the bedroom. J.M. heard additional shots, after which she heard "like an impact, like somebody was hitting or something." J.M. then heard M.M. pleading "Rudy, please stop" to which Williams replied, "Bitch, don't say my name." J.M. also heard noises like "feet dragging or something," and she then heard police arriving. J.M. exited the bedroom and observed M.M. in the living room. M.M's face was bloody and her wig was torn from her head.

{¶14} Sergeant Trevor Sumption of the Warren Police Department responded to a "shots-fired" call at the residence. Upon arrival, he observed M.M. struggling with Williams near a vehicle; Williams appeared to be "yanking" M.M. out of the vehicle. It was difficult to see, but Sergeant Sumption stated the individuals were fighting over a firearm.

4

The sergeant exited his cruiser with his firearm pointed at Williams. Williams then ran from the scene, jumping a fence abutting a wooded area of the home's backyard.

{¶15} Officer Raegan Hoffman of the Warren Police Department also responded. Upon arrival, she observed Sergeant Sumption chasing Williams. Officer Hoffman gave chase, shouting "police" and "stop." The officer was able to catch up to Williams who abruptly turned to her and punched her in the chest. The two fell to the ground in a struggle. Officer Phillip Sajnovsky of the Warren Police Department was approximately 15 feet behind Officer Hoffman at the time and assisted her in handcuffing Williams.

{¶16} Upon being detained, Williams explained he did not know he was being chased by police and claimed he had been stabbed in the back. A claim which was confirmed false.

{¶17} Meanwhile, Sergeant Sumption and Officer Abigail Krafcik of the Warren Police Department entered the residence to check on any additional victims. Upon her arrival, Officer Krafcik observed J.C. and confirmed he was dead. Officer Krafcik found M.M. frantic and crying, wearing a bloody T-shirt with her face covered in blood. M.M. advised the officer that Williams attacked her, shot her, and beat her. M.M.'s wig and a firearm, that was later confirmed forensically to be the weapon used in the murder and attempted murder, were recovered in the driveway of the residence.

{¶18} Warren Police Department Detective Brian Crites arrived at the residence to process the crime scene. Upon his arrival, he observed two victims, one, J.C., deceased and another, M.M., who had not only been shot, but had sustained other obvious injuries to her legs and face.

5

**{¶19}** The detective collected the wig and the firearm from the driveway. The firearm, a Springfield Armory 9mm Luger semi-automatic pistol, model XDS-9 ("Springfield XDS"), had ostensible blood staining throughout the hardware. Detective Crites also collected two bullet casings in the living room, two from the front yard, and one from across the street. He additionally collected pieces of a projectile from the living room.

**{¶20}** Detective Crites was given consent to search the Hyundai SUV, in which Williams arrived at the residence. The detective took photos and evidence from the SUV. The detective found, among other things, a 9mm magazine with cartridges in it; a large amount of cash; and a 9mm handgun under the driver's seat.[1]

**{¶21}** Deputy Jeff Marsolo of the Trumbull County Sheriff's Office took a report of a stolen Springfield XDS handgun from a residence in Fowler, Trumbull County, Ohio, on January 19, 2023. The serial number from the stolen Springfield XDS matched the serial number from the firearm recovered in the driveway at the scene of the incident.

**{¶22}** Keith Jennings, a resident of Fowler, Trumbull County, filed a report in January 2023. He reported a Springfield XDS 9mm firearm, inter alia, was stolen from his home. Mr. Jennings provided the serial number of the firearm to the sheriff's office.

**{¶23}** Mr. Jennings did not know Williams nor did he sell the firearm to Williams. Nevertheless, the serial number matched the weapon found on the driveway of the crime scene.

---

1. Neither this firearm, a SCCY 9mm Luger handgun, model CPX-2, nor a third firearm found in the yard of the residence, a Taurus 9mm Luger semi-automatic pistol, model 709 Slim, were directly connected to the crimes committed during the incident in question. The firearms were tested for DNA and results showed no presumptive positives for blood and, although some DNA was identified, it was insufficient to compare to a standard from an individual.

Case No. 2024-T-0007

**{¶24}** David Miller, a supervisor in the DNA Unit of the Ohio Bureau of Criminal Investigation ("BCI"), took DNA swabs from the Springfield XDS firearm found on the driveway of the residence and determined the samples were suitable for comparison. Mr. Miller found Williams and M.M. were major contributors of the blood DNA on the slide of the firearm. M.M.'s DNA was also found on the bottom of the firearm's magazine, which had tested presumptive positive for blood staining.

**{¶25}** Joshua Barr, a forensic scientist in the firearms section of BCI, determined the Springfield XDS firearm, which was found on the driveway of the residence of the crime scene, was fully operable and capable of firing projectiles. Mr. Barr pointed out that a firearm's barrel includes "lands and grooves," which are high and low marks or spots inside the barrel. Lands and grooves occur during the manufacturing process and exist to stabilize bullets in flight.

**{¶26}** Mr. Barr also discussed "class characteristics" and "individual characteristics" as they relate to particular firearms. "Class characteristics" relate to similarities of like firearms manufactured in the same place with the same type of firing pin and same shape. "Individual characteristics" relate to each individual firearm and can be framed as that firearm's "individual fingerprint." Mr. Barr concluded that the five casings recovered from the crime scene were fired from the Springfield XDS firearm.

**{¶27}** Mr. Barr also tested four bullet-jacket fragments that were recovered from the living room of the residence. He was able to compare two of the fragments and determined they were fired from the Springfield XDS firearm.

**{¶28}** Dr. George Sterbenz, a forensic pathologist and deputy coroner for the Trumbull County Coroner's Office, performed the autopsy on J.C. Dr. Sterbenz pointed

7

out J.C.'s shirt was worn backwards the night of the homicide, and J.C. was shot in the back. Accordingly, the front of the T-shirt had significant blood staining.

{¶29} The doctor was able to note that there was a large "torn defect" on the shirt which represented what he designated as the bullet entry for the "medial wound." Also, Dr. Sterbenz observed soot and gun-powder residue injected into the entrance of the medial wound. Considering these points, the doctor identified the medial wound had "an abraded muzzle imprint . . . and that muzzle imprint will reflect the - - the gun." The doctor therefore concluded the medial wound was "a contact range injury." The bullet entry of the medial wound, among other significant internal damage, severed J.C.'s spinal cord.

{¶30} Dr. Sterbenz also opined that the non-contact wound, i.e., the "lateral wound," caused a fracture of J.C.'s left eighth rib. The bullet then perforated his left lung and continued through his heart and into the pulmonary artery. The bullet causing the lateral wound then exited the body by perforating J.C.'s breastplate or sternum.

{¶31} The trajectory of the bullet causing the medial wound passed through the spinal cord, through the right lung, through the liver, and then exited the body. Although Dr. Sterbenz did not form an express opinion regarding which bullet was fired first, his report designates the lateral-entrance wound as "gunshot wound #1" and the medial-entrance wound as "gunshot wound #2." The doctor stated that the severance of the spinal cord would cause a person to *immediately collapse* and therefore one could reasonably infer that the medial-entrance wound or the "contact-injury" wound was the second shot that was fired.

{¶32} The bullet giving rise to the lateral wound caused 1.6 liters of blood, nearly a half-gallon, to flood J.C.'s chest cavity. The bullet causing the medial wound resulted

8

in an additional 300 cubic centimeters, a little over a cup of blood to fill J.C.'s body. The doctor concluded that J.C.'s death was caused by the multiple gunshot wounds at the hands of another individual.

### III. Williams' Testimony and his Version of Events

{¶33} According to Williams, on April 1, 2023, he was at a coming-home-from-prison party for his sister. He acknowledged M.M. attended the party. Later, he went to a bar where he met his girlfriend, Amoria, and again saw M.M. Later, at approximately 12:30 a.m. on April 2, 2023, Williams went to a second bar where he again met Amoria. The couple left that bar at approximately 2:00 a.m. and went to a Sheetz gas station. While there, a female friend gave Williams a hug which, according to Williams, caused Amoria to mace him. Police arrived and Williams claimed they made him leave the gas station.

{¶34} Williams asserted he intended on going home but the person who he was with left without him. He contacted another friend, a Kelsey Squeglia, who told Williams she last saw Amoria with M.M. Williams enlisted Ms. Squeglia to drive him to J.C.'s and M.M.'s residence expecting to locate his girlfriend.

{¶35} Once Williams and Ms. Squeglia arrived at the residence, Williams exited the vehicle and "banged" on the front screen door. Williams, however, received no response from the occupants.

{¶36} Williams admitted to addressing J.C outside the home. Williams admitted he repeatedly called for J.C., "J-Bae, J-Bae, J-Bae open up the door." Williams also conceded he called out "Y'all gonna make me get on some bullshit. Amoria, if you in there, we're going to get into it." Williams admitted he heard dogs barking and stated, "if

9

one of these dogs break loose, I'm gonna kill one of them." Despite this threat, Williams maintained he had no weapon or firearm on his person.

{¶37}  Ultimately, Williams stated J.C. and M.M. emerged from the home, and J.C. asked why Williams was banging on the door. J.C. then sent M.M. back inside the residence; Williams claimed he was at the house to find his girlfriend, Amoria.  According to Williams, a verbal exchange occurred during which he told J.C., "I beat your ass . . . I'll knock you the fuck out here."

{¶38}  After the exchange, Williams claimed that M.M. appeared and immediately went back inside.  She then reappeared and allegedly stated, "boy, get the fuck on. Get the fuck out of here,"  to which Williams responded, "Bitch, shut the fuck up before I smack you." At this point, Williams claimed that J.C. put his finger near Williams' face, which Williams smacked away. Williams asserted a "tussle" ensued wherein J.C. tried to sweep him to the ground.

{¶39}  The men spun, and Williams stated he heard "boom, boom." After hearing the shots, Williams claimed J.C. fell to the ground immediately.

{¶40}  Afterwards, Williams asserted M.M. was aiming a gun in his direction. He claimed he tried to take the weapon and, in the process, struck M.M. in the face "approximately eight to ten times before she finally released the gun."  Williams then shot the gun into the home, into which M.M. had fled.

{¶41}  Williams admitted his intention was to shoot M.M. Despite admitting his intent to shoot M.M., Williams claimed he went inside the residence, dropped the gun, and attempted to help M.M. According to Williams, however, M.M. tried to grab the weapon, and Williams admitted to striking M.M. again.

10

**{¶42}** As the struggle continued, M.M. asked, "Rudy, why are you doing this? Rudy, what are you doing?" To which Williams responded, "Stop saying my fucking name. If you wouldn't have brought that gun outside and stayed in the house none of this would have happened." Williams claimed he then attempted to force M.M. into Ms. Squeglia's vehicle to assist her in seeking medical attention for her injuries. According to Williams, police arrived, he panicked, and then ran away.

**{¶43}** Williams was apprehended and was notably uncooperative during his arrest.

## IV. Charges and Proceedings

**{¶44}** On April 6, 2023, Williams was indicted on the following charges: Count One: Aggravated Murder with a Specification of Aggravating Circumstances, a Repeat Violent Offender Specification, and a Firearm Specification, in violation of R.C. 2903.01(A) and (G), R.C. 2941.145, R.C. 2941.149, R.C. 2929.04(A)(5), and R.C. 2929.04(A)(7); Count Two: Aggravated Murder with a Specification of Aggravating Circumstances, a Repeat Violent Offender Specification, and a Firearm Specification, in violation of R.C. 2903.01(B) and (G), R.C. 2941.145, R.C. 2941.149, R.C. 2929.04(A)(5), and R.C. 2929.04(A)(7); Count Three: Attempted Murder, a felony of the first degree, with a Repeat Violent Offender Specification and a Firearm Specification, in violation of R.C. 2923.02(A) and (E)(1), R.C. 2903.02(B) and (D), R.C. 2941.145, and R.C. 2941.149; Count Four: Felonious Assault, a felony of the second degree, with a Repeat Violent Offender Specification and a Firearm Specification, in violation of R.C. 2903.11(A)(1) and (D)(1)(a), R.C. 2941.145, and R.C. 2941.149; Count Five: Kidnapping, a felony of the first degree, with a Firearm Specification and a Repeat Violent Offender Specification, in

11

violation of R.C. 2905.01(A)(2) and (C)(1), R.C. 2941.145, and R.C. 2941.149; Count Six: Aggravated Burglary, a felony of the first degree, with a Firearm Specification and a Repeat Violent Offender Specification, in violation of R.C.2911.11(A)(1) and (B), R.C. 2941.145, and R.C. 2941.149; Count Seven: Having Weapons While Under Disability, a felony of the third degree, with a Firearm Specification, in violation of R.C. 2923.13(A)(2) and (B), and R.C. 2941.145; Count Eight: Receiving Stolen Property, a felony of the fourth degree, in violation of R.C. 2913.51(A) and (C); and Count Nine:  Assault on a Peace Officer, a felony of the fourth degree, in violation of R.C. 2903.13(A) and (C)(5).[2]

{¶45}  Williams pleaded not guilty to the charges and the matter proceeded to a jury trial. After trial, the state moved the trial court to amend the indictment. The state maintained the amendment did not change the name, identity, or degree of the offense of the charge, but merely sought to correct a clerical error. The state sought to amend Count Four: Felonious Assault to conform with the evidence and jury instruction that Williams shot M.M., by means of a deadly weapon, and caused physical harm. The trial court granted the motion.

{¶46}  The jury entered a verdict of guilty on each offense, as well as the associated specifications, with the exception of the specifications of Repeat Violent Offender and the offense of Having Weapons Under Disability; as it pertained to those determinations, Williams requested the trial court to issue a verdict. The trial court found Williams guilty on those specifications and that charge.

---

2. The multiple "Repeat Violent Offender" specifications were ostensibly premised upon Williams' past record which included two felonious assault convictions as well as an abduction conviction.  Williams testified to each prior crime of violence. And, at the time of the indictment in the matter sub judice, Williams was still on parole. Williams admitted at trial that he had a long history of "beating and hitting other people," some of whom were women.

12

Case No. 2024-T-0007

**{¶47}** The matter proceeded to the mitigation phase, after which the jury declined to impose the death penalty. Instead, it recommended a sentence of life in prison without the possibility of parole.

**{¶48}** At sentencing, the trial court merged Counts One and Two for purposes of sentencing. The state elected to proceed to sentencing on Count One. Similarly, the trial court merged Counts Three and Four for purposes of sentencing, and the state elected to proceed to sentencing on Count Three.

**{¶49}** The trial court imposed an aggregate prison sentence of life without the possibility of parole, plus an indefinite sentence of a minimum of 81 years up to a maximum sentence of 86 and one-half years. This appeal follows.

## V. Sufficiency and Weight of the Evidence

**{¶50}** Williams' first assignment of error provides:

**{¶51}** "Appellant's convictions are not supported by sufficient evidence and are against the manifest weight of the evidence."

**{¶52}** When an appealing party challenges both the sufficiency and the weight of the evidence, the appellate court need only address the manifest weight argument if it concludes that the verdict is consistent with the manifest weight because this conclusion presupposes the verdict was also supported by sufficient evidence. *State v. Masters*, 2020-Ohio-864, ¶ 17 (11th Dist.).

**{¶53}** With this point in mind, a court reviewing a challenge to the manifest weight of the evidence considers the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the jury lost its way such that a manifest miscarriage of justice

13

resulted requiring a reversal of the conviction and a new trial ordered. *State v. Schlee*, 1994 WL 738452, *5 (11th Dist. Dec. 23, 1994). In other words, an appellate court must assess conflicting testimony, review rational inferences that may be drawn from the evidence, and evaluate the strength of the conclusions drawn therefrom. *State v. McFeely*, 2009-Ohio-1436, ¶ 78 (11th Dist.) A challenge to the weight of the evidence requires the reviewing court to assess whether the state met its burden of persuasion. *Id.*

**{¶54}** We shall first consider whether the jury lost its way in finding the state's theory of the case relating to the aggravated murder conviction was more credible than Williams' rendition of events.

### A. Aggravated Murder Conviction

**{¶55}** In his appellate brief, Williams initially argues that his version of events relating to the shooting of J.C. was more credible than the state's theory due to the position of J.C.'s body after the homicide.

**{¶56}** Specifically, Williams points out that M.M. admitted she did not see the shooting; still, M.M. testified, after leaving J.C. and Williams outside the house, and then hearing gunshots, she observed J.C. lying on his back with his feet on the porch area of the residence near the threshold of the front door.

**{¶57}** Williams argues there was no forensic evidence that could support M.M.'s description of J.C.'s body positioning. Williams posits that if, as the state maintains, he shot J.C. twice in the back and J.C. was walking toward the front door, J.C. would necessarily fall forward (i.e., face down) toward the door. As such, he contends the state's rendition of events is unreasonable, and his theory that M.M. shot J.C. in an effort to hit him is significantly more tenable.

14

**{¶58}** We do not agree with Williams' underlying premises.

**{¶59}** M.M., Ms. Lynk, and J.M. each testified that the two shots fired (that were reasonably associated with the fatal shots) occurred in rapid succession. Ms. Lynk testified that M.M. was inside the house during the exchange which occurred outside the home between J.C. and Williams. Ms. Lynk stated that she asked M.M. "what's going on," to which M.M. responded, referring to Williams, "I don't know, mama. I don't know. He mad. He mad about something." Ms. Lynk testified that, when she heard the second round of shots, M.M. was "in the front room or the hallway because she screamed . . . and ran to where I was and was like 'Mama, he shot [J.C.]."

**{¶60}** Similarly, J.C.'s older sister, J.M., testified that while J.C. was outside addressing Williams, M.M. had returned to the guest bedroom and stated that Williams was angry because "his girlfriend got maced at the gas station or something." While M.M. was in the bedroom, J.M. heard two shots fired outside. J.M. testified she then called 911. According to J.M., M.M. left the bedroom and then ran back exclaiming, "Mama, he shot [J.C], He shot [J.C.]."

**{¶61}** The foregoing testimony demonstrates that M.M. was not the shooter because, during the relevant times the witnesses heard gunfire, she was with them in the guest bedroom.

**{¶62}** Moreover, contrary to Williams' assertions, Dr. Sterbenz's testimony and report established a reasonable, medico-forensic basis for the state's theory (as well as substantiating M.M.'s observation of the positioning of J.C.'s body).

**{¶63}** According to the doctor's report and testimony, the lateral-entrance wound caused significant internal trauma due to the puncturing of the left lung, the heart,

15

pulmonary artery, and then exited J.C.'s sternum or breastplate. The damage of the shot entering laterally created massive hemorrhaging which began to fill J.C.'s chest cavity with nearly one-half gallon of blood.

{¶64} According to Dr. Sterbenz, the other shot, deemed the medial-entrance wound, was a contact wound to J.C.'s back. This shot severed J.C.'s spinal cord (among other catastrophic injuries) and ultimately exiting J.C.'s body. The doctor testified the initial trauma from the shot causing the medial-entrance wound would cause a person to "immediately collapse."

{¶65} Given this evidence, the jury could reasonably conclude the lateral wound occurred first, as J.C. was walking away from Williams, and Williams approached J.C. and shot him a second time in the back, causing the medial entrance wound, severing the spinal cord.

{¶66} Simply because J.C. was walking away from Williams when he was initially shot in the back, does not mean he would necessarily fall forward. The second shot, according to the doctor, "passes through the back bone, or in this case the thoracic vertebra at level T10, and it went through the spinal cord." Dr. Sterbenz testified, "if one is standing and this injury were to occur, you would fall down." The forensic evidence supports the conclusion that J.C. would suddenly collapse and, depending on his wavering balance, fall onto his back.

{¶67} The forensic evidence offered by the state via Dr. Sterbenz, in conjunction with the witness testimony, demonstrates, beyond a reasonable doubt, that Williams could have shot J.C. in the back causing the lateral entrance wound. That wound, while

16

causing catastrophic internal trauma, *would not* necessarily cause J.C. to immediately collapse.

{¶68} The testimony of M.M., Ms. Lynk, and J.M. provide a reasonable basis for the conclusion that the shots which are connected to J.C.'s murder occurred in quick succession. In this regard, the jury could reasonably conclude Williams shot J.C. causing the lateral-entrance wound, then quickly shot J.C. causing the medial-entrance, contact wound that severed the spinal cord. This injury, per Dr. Sterbenz, would necessarily cause J.C. to immediately fall to the ground.

{¶69} Accepting, as we must, this reasonable construction of the evidence, a reasonable jury could conclude that J.C. dropped backwards after having his spinal cord severed, onto his back so that his feet would be facing the front door of the residence.

{¶70} It bears mention that Williams' argument is additionally problematic because Dr. Sterbenz reported that each of the shots passed through J.C.'s body. Significantly, the shot causing the lateral wound exited J.C.'s body via his sternum or breastplate. During cross-examination of Williams, he admitted that, according to his version of events, he and J.C. were struggling, and during the struggle, they were hanging onto one another. The prosecutor and Williams then had the following exchange:

> [PROSECUTOR]: So a bullet comes through [J.C.'s] back, goes through his lungs and through his breastplate and never hits you?
>
> [WILLIAMS]: No. sir. You were saying something different than what I said. I said that we were - - we started off tussling and his back was towards the entry of the house when he first started tussling. My back is towards [M.M.] I never seen [M.M.] with a weapon or anything.[J.C.] put - - [J.C.] tried to clip slam me, and as we spin - - as we were spinning two shots went off. My back hit the base of the house. As I looked up, [M.M.] was in reaching distance.

17

[PROSECUTOR]: So you fell down?

[WILLIAMS]: I never fell down.

[PROSECUTOR] Well, you're 6'3?

[WILLIAMS]: Yes.

[PROSECUTOR]: He's 5'9. His chest is probably in your midsection somewhere. And that bullet goes completely through him and miraculously misses you?

[WILLIAMS]: Yes, sir. The way we were turning - - the way we were turning and the way - - the way [J.C.] fell, it was like he was like more so towards my left. And it's like he - - it's like he almost tried to, like, turn around to see where the shots came from as he was falling.

{¶71} This dialogue indicates that, according to Williams, M.M. shot J.C. from (at least) some distance, but neither of the bullets which passed through his body, struck Williams. Williams agreed with the prosecutor that the bullet that passed through J.C.'s chest "miraculously" missed him. The jury was at liberty to find Williams' explanation not credible, especially in light of the evidence adduced by other witnesses and Dr. Sterbenz.

{¶72} Further, the jury had already heard Dr. Sterbenz's testimony that the medial wound was a contact wound. Williams' version of events does not account for this evidence. While he stated M.M. was "in reaching distance," this does not imply she was so close that she pointed and placed the barrel of the firearm directly on J.C.'s back and shot him. This is especially problematic because Williams' theory implies that M.M. fired the shots trying to shoot him, not J.C. To the extent the jury believed Dr. Sterbenz's opinion regarding the nature of the medial, contact wound, Williams' rendition of events lacks credibility. After all, M.M., in attempting to shoot Williams would not, at the same time, place the barrel of the firearm on J.C.'s back and fire the weapon.

18

Case No. 2024-T-0007

**{¶73}** Williams' argument, in this respect, lacks merit.

**B. Attempted Murder, Aggravated Burglary, and Kidnapping Convictions**

**{¶74}** Next, Williams takes issue with the jury's verdict regarding the attempted murder, aggravated burglary, and kidnapping convictions relating to M.M. Williams argues the state did not provide any evidence of motive which might support these convictions. Instead, in his appellate brief, Williams maintains, "[he] was obviously trying to get her medical attention. The same can be said of the aggravated burglary charge."

**{¶75}** First of all, the state is not required to prove motive to meet its burden of production in a prosecution. *State v. Woodson*, 2010-Ohio-1671, ¶ 24 (8th Dist.) ("Motive is not an element of the offense of aggravated murder that the state must prove beyond a reasonable doubt."), citing *State v. Lancaster,* 167 Ohio St. 391 (1958), paragraphs one and two of the syllabus

**{¶76}** We are aware that establishing a motive is useful for a factfinder to understand and appreciate the sequence of events which lead to eventualities relevant to a case under consideration. "There can be no question that evidence of motive in murder cases is always relevant and material." *Lancaster.* at 396. This observation applies with similar force to attempted murder, kidnapping, and aggravated burglary cases. Nevertheless, motive is not an element of any of the crimes with which Williams takes issue.

**{¶77}** Despite this point, the evidence adduced by the state created a persuasive tableau that undermines Williams' claim that he was simply interested in "helping" M.M. after he shot her. In other words, his convictions for Attempted Murder, Aggravated

Burglary, and Kidnapping are supported by sufficient evidence as well as the greater weight of credible evidence.

{¶78} Williams does not dispute he shot M.M. He testified that he fired shots while M.M. was reentering the home, and his intention was "[t]o hit her." Defense counsel asked "[t]o shoot her?" and appellant responded in the affirmative.

{¶79} Williams was found guilty of and convicted of Attempted Murder. To establish the elements of attempted murder, the state was required to prove that the defendant engaged in conduct that, if successful, would cause the death of another that is a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree. R.C. 2903.02(B); R.C. 2923.02(A).

{¶80} Williams admitted to intentionally trying to shoot M.M. with a firearm that had already killed another. The jury did not err in finding Williams guilty of Attempted Murder.

{¶81} M.M. testified that, after she returned inside the residence at J.C.'s request, she heard gunshots. She ran to the front door and observed J.C. on the ground. She testified:

> As I'm standing there, his eyes is wide open. He's just laying there. But, like, I could tell that he was - - he was gone. So I hear, like, gravel, like rocks. So I look back over my shoulder and Rudy is coming up, but as he's running up he has the gun in his hand pointing at me. So I got up, I go to run back in the house but in my head I'm thinking, like, if I run straight down this hallway and try to, like, run in our room or run somewhere, I could get shot out at my back so I hit the floor. So he comes in behind, like, as he come in he, like, trips over [J.C.'s] feet. He don't fall but he stumbled. He get to shooting. I'm, like, at this point I'm in between our couches trying to get around, but the foot of the couch was up because his sister was on that couch. He - - still he comes in. He, like, flipped, like, flipped

20

the table, our center table, and he grabbed me by the back of my head. He was like, "Huh-uh, bitch."

He grabbed me. He pulled me back. He get to beating me with the gun. I don't feel it but I can hear it. So I get to screaming, like "Rudy, stop. Please stop. Stop." He still hitting me, like, "Bitch, stop saying my name. Stop saying my name. Stop saying my name." So he's dragging me, like, to bring me outside. So as he's dragging me, of course he got to drag me over [J.C's] feet because [J.C.'s] feet is right there in the door. So, like, we're tussling, like, I'm trying to pull away as he's still pulling me.

So we get outside. He pulls me over [J.C's] feet. He pulls me off the porch. He's pulling me through the gravel. My legs and everything was all scraped up. I'm bleeding, like, a lot on my head, not even knowing that I was shot or anything.

{¶82} Williams was found guilty of and convicted of Kidnapping, in violation of R.C. 2905.01(A)(2), a felony of the first degree, which provides: "No person, by force . . . shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes . . . [t]o facilitate the commission of any felony or flight thereafter . . . ."

{¶83} Williams was also found guilty of and convicted of Aggravated Burglary, in violation of R.C. 2911.11(A)(1), a felony of the first degree, which provides: "No person, by force, stealth, or deception, shall trespass in an occupied structure . . . when another person other than an accomplice of the offender is present, with purpose to commit in the structure . . . any criminal offense, if any of the following apply . . . [t]he offender inflicts, or attempts or threatens to inflict physical harm on another . . . ." Criminal trespass is defined in R.C. 2911.21(A)(1), which states, "[N]o person, without privilege to do so, shall . . . [k]nowingly enter or remain on the land or premises of another . . . ." "Privilege" is defined as "an immunity, license, or right conferred by law, bestowed by express or

21

implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12).

{¶84} Williams was additionally found guilty of felonious assault (but not convicted of this count due to its merger, for purposes of sentencing, with Count Three, Attempted Murder), in violation of R.C. 2903.11(A)(1), a felony of the second degree, which provides: "No person shall knowingly do either of the following . . . Cause serious physical harm to another or to another's unborn . . . .]"

{¶85} The evidence demonstrated Williams, after shooting and beating M.M., forcibly removed her from the residence, dragged her across the driveway, and attempted to force her into a vehicle. This evidence establishes kidnapping beyond a reasonable doubt.

{¶86} Further, the evidence supports the credible conclusion that Williams engaged in a trespassory entry into the residence. Shell casings were found in the residence. Williams does not deny he tried to shoot M.M. and, if the shots were fired inside the residence, this is sufficient, credible evidence to support the aggravated burglary conviction, either by way of the guilty finding on the felonious assault count or the conviction on the attempted murder count.

{¶87} M.M.'s testimony, unto itself, demonstrates Williams committed attempted murder, felonious assault, and kidnapping. She was shot by Williams, she was severely beaten by Williams, and she was then forcibly dragged out of the home by Williams who attempted to shove her in a vehicle to flee from the scene. Although Williams' testified he was merely removing M.M. as a "good Samaritan" to take her to the hospital due to her wounds, the jury was free to disregard his version of events.

22

**{¶88}** The substantial weight of the evidence militates against Williams' arguments.

**{¶89}** Williams' convictions for attempted murder, aggravated robbery, and kidnapping are therefore supported by sufficient, credible evidence.

### C. Receiving Stolen Property

**{¶90}** Williams also, in passing, contends the state "presented no evidence whatsoever that the stolen firearm in question had been stolen by [him] as opposed to [M.M.] or one of her cohorts." Williams' contention is misplaced.

**{¶91}** Williams was charged with Receiving Stolen Property, in violation of R.C. 2913.51(A), which provides: "[N]o person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."

**{¶92}** The state was not obligated to establish Williams actually stole the firearm used in the offenses at issue, only that he received or retained it with reasonable cause to believe the firearm *was obtained* through the commission of a theft offense. We hold the state offered sufficient, credible evidence to meet the elements of the crime.

**{¶93}** Although Williams claimed he was not armed when he arrived at the residence, M.M. also testified she was unarmed. She additionally testified that Williams was in possession of the firearm and shot her after he delivered the fatal shots to J.C. And there was forensic evidence establishing that the firearm stolen from Mr. Jennings' home was used in the murder and attempted murder.

**{¶94}** The evidence and testimony demonstrated that Williams actually arrived at the residence with the firearm in question, the firearm had been confirmed stolen by Mr.

23

Jennings from his home, and Williams used the firearm in the murder of J.C. and the attempted murder of M.M.

{¶95} Additionally, and critically, the state established that Williams was a convicted felon and had no legal ability to purchase or possess a firearm. The circumstantial evidence supports the conclusion, beyond a reasonable doubt, that Williams possessed and used the stolen firearm during the incident and, owing to his status as a convicted felon, would have reasonable cause to believe the firearm was obtained through a theft.

{¶96} The receiving stolen property conviction is supported by credible evidence.

**D. Prior Calculation and Design**

{¶97} Williams next argues the state failed to establish he acted with "prior calculation and design," a necessary element to support the aggravated murder conviction. He claims the prosecution's theory of the case failed to set forth a discernable motive for the crimes, let alone one which would permit the inference that he had a pre-existing plan to commit the crimes. Williams claims the record is devoid of any evidence supporting a finding of prior calculation and design. Although Williams draws the foregoing conclusions, he fails to connect specific facts that would support a rationale for his position.

{¶98} As observed above, the state is not required to establish a motive to ensure a conviction. It must, however, prove the elements of the crime charged beyond a reasonable doubt. That said, R.C. 2903.01(A) provides: "No person shall purposely, and with prior calculation and design, cause the death of another . . . ." The General Assembly

24

explicitly rejected the notion that brief premeditation prior to a murder could establish prior calculation and design:

> "[R.C. 2903.01(A) employs] the phrase, 'prior calculation and design,' to indicate an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must be sufficient to meet the proposed test of 'prior calculation and design.' In this context, *momentary deliberation is considered insufficient* to constitute a studied scheme to kill."

(Emphasis added in *Walker*.) *State v. Walker*, 2016-Ohio-8295, ¶ 17, quoting Ohio Legislative Service Commission, *Proposed Ohio Criminal Code: Final Report of the Technical Committee to Study Ohio Criminal Laws and Procedures,* at 71 (1971).

{¶99} The mens rea of "purpose" is defined as follows: "[a] person acts purposely when it is the person's specific intention to cause a certain result . . . ." R.C. 2901.22(A). Evidence of purpose, however, does not necessarily imply the existence of prior calculation and design. *Walker* at ¶ 17, citing *State v. Campbell,* 2000-Ohio-183, 341. ("purpose to kill is not the same thing as prior calculation and design and does not by itself satisfy the *mens rea* element of R.C. 2903.01(A)." (Emphasis sic.)). As R.C. 2903.01(A) plainly states, aggravated murder requires proof of both purpose *and* prior calculation and design.

{¶100} The phrase, "prior calculation and design" implies "advance reasoning to formulate the purpose to kill." *Walker* at ¶ 18. Evidence of a killing committed on the spur of the moment or after momentary consideration is not sufficient to establish a premeditated decision or a "studied consideration" of the method and the means to effectuate a death. *Id.*

25

{¶101} The General Assembly has determined that it is a greater offense to premeditate or to plan ahead and purposely kill another, rather than to merely kill with purpose. *Id.*, 2016-Ohio-8295. In this regard, it is reasonable to conclude that aggravated murder may be established where a killing occurs with purpose and the defendant formed the design or intent to kill before the act, i.e., "prior calculation and design" does not necessarily require that the act be planned, contrived, or schemed beforehand, but there must be evidence of reflection or deliberation before the defendant's purposeful action(s).

{¶102} The Supreme Court of Ohio has underscored that there is no "bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *State v. Taylor,* 1997-Ohio-243, 20; *State v. Braden,* 2003-Ohio-1325, ¶ 61; *State v. Maxwell,* 2014-Ohio-1019, ¶ 148.

{¶103} Instead, the court has commonly considered three factors in determining whether a defendant acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'" *Taylor* at 19, quoting *State v. Jenkins,* 48 Ohio App.2d 99, 102 (8th Dist. 1976). Considering these factors, "prior calculation and design" may be viewed as a state of mind generally established circumstantially through drawing inferences from a defendant's conduct in light of the totality of the circumstances.

{¶104} Regarding the above factors, it is undisputed that Williams and J.C. knew each other for many years and Williams considered him like an older brother.

26

{¶105} Although Williams claimed he did not arrive at the scene with a firearm, the jury heard testimony from M.M., Ms. Lynk, and J.M. that, prior to the murder, Williams was heard outside threatening to shoot dogs as well as the cars in the residence's driveway. Moreover, prior to the murder and attempted murder, each of the women heard gunshots outside the residence. Ms. Lynk heard two shots prior to J.C. exiting the home; J.M. heard "one. [I]t could have been two." M.M. also testified that she heard gunshots as she and J.C. were walking out of their bedroom.

{¶106} Finally, M.M., Ms. Lynk, and J.M. heard Williams entreating J.C. to come outside and confront him. That is, Williams was overheard calling J.C. by his nickname several times. Ms. Lynk asserted she heard Williams order J.C. to "come outside, mother fucker . . . This is my shit. I run this." Similarly, J.M. heard Williams exclaim "N . . . .r, you better come outside. I'm gonna shoot these dogs." This testimony provides strong evidence that not only did Williams arrive at the residence (the murder site) with a firearm, but that he arrived at the residence with the murder weapon and was purposefully interested in creating a confrontation with J.C.

{¶107} From these points, the jury could reasonably conclude that the episode was sufficiently "drawn out" such that Williams, in possession of the firearm, threatening to shoot dogs and cars, and ordering J.C. to come outside, involved a process which included thinking about shooting J.C. before he engaged in the homicidal conduct. Put differently, the murder was not the result of an instantaneous or near instantaneous explosion of sudden events.

{¶108} And, significantly, there was no evidence of provocation on J.C.'s part. To the contrary, *Williams' conduct* prior to encountering and during his encounter with J.C.,

27

and nothing else, evince a form of reflection and deliberation that can reasonably be viewed as premeditation. His confrontation was planned, he arrived at the residence armed and, after the confrontation, purposely shot an unarmed man in the back causing his death.

{¶109} In our view, the state presented sufficient, credible evidence that Williams acted with the intention and purpose to kill J.C. and this intention and purpose was supported by evidence which would allow a jury to conclude, beyond a reasonable doubt, that he acted with prior calculation and design.

{¶110} As a reviewing court, we "'give great deference'" to the jury's evaluation of the evidence and witness's credibility. *State v. Cook*, 2017-Ohio-7953, ¶ 75 (11th Dist.), citing *State v. Covington*, 2002-Ohio-7037, ¶ 28 (10th Dist.). The jury is charged with assessing a witness' credibility, and an appellate court cannot substitute its judgment for that of the jury. *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). And "[a] reviewing court must interpret the evidence consistent with the verdict if it is susceptible to more than one interpretation." (Citations omitted.) *Cook* at ¶ 75

{¶111} Accordingly, we conclude that the judgment of conviction is premised upon sufficient evidence and is consistent with the manifest weight of the evidence.

{¶112} Williams' first assignment of error lacks merit.

## VI. Amendment of the Indictment

{¶113} Under his second assigned error, Williams alleges:

{¶114} "The trial court erred by permitting the state to amend the indictment after closing arguments, jury instructions[,] and submission of the case to the jury."

28

{¶115} Williams claimed error rests solely on the timing of the indictment's amendment and does not assert error in the actual changes made to the instrument.

{¶116} In this case, the state moved to amend the indictment after the jury instructions had been issued in order to reflect the full language of the felonious assault statute with which Williams was charged. In the original indictment, Williams was charged with Felonious Assault, a felony of the second degree, alleging he "did knowingly cause serious physical harm to another, one [M.M.]"

{¶117} The state's motion to amend requested the court to permit the amendment to conform with the evidence and the jury instruction upon which the parties ostensibly agreed.[3] The instruction issued by the court provided: "Count 4, Felonious Assault of [M.M.] . . . you must find beyond a reasonable doubt that on or about April 2nd, 2023, and in Trumbull County, Ohio the defendant caused or attempted to cause physical harm to [M.M.] by means of a deadly weapon."

{¶118} Both the original indictment and proposed amendment involved a charge of Felonious Assault, a felony of the second degree.

{¶119} Crim.R. 7(D) provides: "The court may at *any time before, during, or after a trial* amend the indictment . . . in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged." (Emphasis added.)

{¶120} "'Under Crim.R. 7(D), a court may amend an indictment "at any time" if the amendment does not change "the name or identity of the crime charged."'" *State v. Pence*, 2024-Ohio-3067, ¶ 16 (11th Dist.), quoting *State v. Davis*, 2008-Ohio-4537, ¶ 1. The

---

3. There is nothing to suggest that defense counsel objected to the instruction.

Case No. 2024-T-0007

amendment did not change the name or identity of the crime charged. We discern no error in the trial court's general decision to permit the amendment.

{¶121} If an amendment to an indictment does not change the name or identity of the crime charged, however, then an appellate court applies an abuse of discretion standard of review to the trial court's decision to allow a Crim.R. 7(D) amendment. *See State v. Jones*, 2015-Ohio-4116, ¶ 125 (2d Dist.). An abuse of discretion connotes a trial court's failure to exercise reasonable and sound decision-making. *See, e.g., Pence* at ¶ 19. In addition, an appealing party must show prejudice as a result of the amendment. *State v. Madding,* 2011-Ohio-3865, ¶ 11 (2d Dist.).

{¶122} In this case, the trial court did not abuse its discretion in granting the motion and Williams did not suffer prejudice. Although Williams was found guilty of Felonious Assault, as charged in Count Four, that charge merged with Count Three, Attempted Murder, for purposes of sentencing. The state elected to proceed to sentencing on the Attempted Murder verdict.

{¶123} A conviction requires both a verdict of guilty and the imposition of sentence. *State v. Whitfield*, 2010-Ohio-2, ¶ 12. Because the trial court imposed no sentence for the Felonious Assault verdict, Williams was not convicted of that offense. *State v. Daniels*, 2021-Ohio-790, ¶ 105 (11th Dist.). Without a conviction relating to the amended Felonious Assault charge under Count Four, Williams suffered no prejudice from the amendment.

{¶124} Despite the foregoing analysis, Williams claims that his "trial counsel had no opportunity to argue terms of the statute properly before the jury . . . and a new trial must be ordered." He essentially makes a due-process argument in a vacuum. We find

30

this argument unavailing, particularly considering our conclusion that Williams suffered no prejudice due to the amendment.

**{¶125}** The language "at any time before, during, or after a trial" in Crim.R. 7(D) implies that even after jury instructions are issued, the state could properly amend the indictment if there was no change to the "name or identity of the crime charged." Here, the motion was filed on November 8, 2023, it was granted on the same day, and the jury's verdict was rendered on November 9, 2023. As noted, there was no change to the name or identity of the crime. Therefore, the timing of the amendment was proper when conducted before the jury verdict. *See also State v. Isenogle*, 2022-Ohio-1257, ¶ 18, 38 (5th Dist.) (upholding a trial court's ability to amend an indictment *after* a jury verdict so long as the name or identity of the crime is not changed).

**{¶126}** Williams had notice of the elements of the crime and an opportunity to defend the same at trial. The amendment merely adjusted the charge to conform to the jury instructions and the evidence that Williams did not dispute. Williams admitted to knowingly and intentionally shooting M.M (i.e., the crime of Felonious Assault which merged with the Attempted Murder crime). The amendment reflected this admission. We cannot fathom how Williams' right to due process could have been violated under these circumstances.

**{¶127}** The amendment at issue conformed with Crim.R. 7(D); moreover, the trial court acted within its sound discretion in granting the same and Williams has failed to establish prejudice.

**{¶128}** Williams' final assigned error lacks merit.

31

## VII. Conclusion

**{¶129}** The Trumbull County Court of Common Pleas judgment is affirmed.

MATT LYNCH, J.,

ROBERT J. PATTON, J.,

concur.

Case No. 2024-T-0007