[Cite as *State v. Diallo*, 2025-Ohio-920.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                              :

    Plaintiff-Appellee,                              :

                                 No. 23AP-496
v.                                                             :
                           (C.P.C. No. 21CR-4188)

Mamadou Aliou Diallo,                            :                    (REGULAR CALENDAR)

    Defendant-Appellant.                           :

---

D E C I S I O N

Rendered on March 18, 2025

---

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Taylor M. Mick*, for appellee.

**On brief:** *Conrad/Wood*, and *Scott P. Wood*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Mamadou Aliou Diallo, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to jury verdicts finding him guilty of two counts of murder, aggravated arson, tampering with evidence, and abuse of a corpse. For the following reasons, we affirm but remand for the limited purpose of correcting the sentencing entry.

## I. Facts and Procedural History

{¶ 2} At approximately 1:09 p.m. on September 30, 2021, Diallo called 911 to report a fire at his home on Noe Bixby Road in Columbus, Ohio.[1] Diallo requested assistance and

---

[1] The 911 recording introduced at trial established that the call initially disconnected before Diallo provided any information and that the 911 operator called Diallo back to determine if assistance was required. (State's Ex. N.)

told the operator he had gotten his children out of the house. When the operator asked if everyone was out of the house, Diallo responded, "I just got the kids out. I can -- I couldn't go in. I tried to get in. I can't go in the house." (July 18, 2023 Tr. at 742.) The operator then asked where the fire was in the house, suggesting it could be in the kitchen or living room. Diallo stated that he did not know what room the fire was in; he believed it was in the kitchen, but it might have been in the living room.

{¶ 3} A fire engine from the Madison Township Fire Department arrived on the scene, followed closely by a rescue unit from the City of Columbus Division of Fire. When firefighters entered the home and began searching for the location of the fire, a Columbus firefighter found a deceased person in a lower-level living room. The deceased person, later identified as Diallo's wife, Fatoumata Diallo ("Fatoumata"), was lying on her back on the floor, with a cord tied around her neck and severe burns to the upper portion of her body. The living room where Fatoumata was found was filled with soot and smoke and contained a few small areas of smoldering fire that the firefighters extinguished. An investigation of the fire and Fatoumata's death was conducted by members of the Madison Township Police Department, the Franklin County Sheriff's Department, and investigators from the State Fire Marshal's Office.

{¶ 4} Following the investigation, in October 2021, Diallo was indicted on two counts of murder, one count of aggravated arson, one count of tampering with evidence, and one count of gross abuse of a corpse. A jury trial was conducted on the charges in July 2023. The parties stipulated to certain facts for purposes of trial, including that Diallo had filed for divorce on March 16, 2018, and Fatoumata had filed for divorce on June 7, 2018, and that Diallo had voluntarily dismissed his divorce petition on January 3, 2019.

{¶ 5} At trial, a Madison Township Fire Department lieutenant in charge of the first fire engine testified she did not observe any abnormalities, such as broken windows or broken doors, when assessing the perimeter of the house before firefighters entered. She stated that when firefighters entered the home, there was dark, black smoke filling the upper two-thirds of the doorway. The Columbus firefighter who found Fatoumata's body testified she was too badly burned to be saved and verified she had no pulse when found. He further testified it was unusual to find a victim lying on her back in the middle of a room in a daytime fire because victims of daytime fires were usually found near doors or windows,

indicating they tried to escape the fire. There was a cable or cord around Fatoumata's neck, later determined to be consistent with a USB-type electronics cable. The cable was tied in a knot at the back of Fatoumata's neck. The loose end of the cable extended beneath a nearby sofa, but it was not tied or fixed to anything.

{¶ 6} Robert Schneider, who was the Madison Township Fire Department battalion chief on September 30, 2021, testified that he spoke with Diallo after arriving on the scene, before Fatoumata's body had been found. Chief Schneider asked Diallo whether everyone was out of the house and Diallo responded yes. Later, after being advised by other firefighters that a victim had been found in the house, Chief Schneider asked Diallo if he realized someone else had been in the house. Chief Schneider testified that Diallo "did not give me a straight answer at first and looked confused [a]nd then after I asked him a second time he stated to me, it was the kids' mother." (July 13, 2023 Tr. at 256.) He testified that Diallo was "reasonably calm" and "did not show any concern over the person that was still in the house," and asserted that Diallo seemed more concerned about obtaining food for the young children who were with him. (July 13, 2023 Tr. at 257.) Chief Schneider testified that this apparent lack of sadness was different from his experience at other fatal fires, although on cross-examination he admitted he had no knowledge of the culture in Diallo's home country of Guinea.

{¶ 7} Sergeant Victor Boyd of the Madison Township Police Department spoke with Diallo, while Diallo and his two youngest children were waiting in and around a Toyota Tacoma truck parked in the driveway. Sergeant Boyd characterized Diallo as relaxed and nonchalant during their conversation. Videos of Sergeant Boyd's interaction with Diallo, recorded by a body-worn camera, were played for the jury. In the videos, Diallo confirmed that the person found in the house was his wife, and stated that she had returned from Guinea two weeks earlier. Sergeant Boyd asked Diallo what time he arrived home and found smoke; Diallo responded that it was about 12:00 or 12:30 p.m. Diallo then reviewed the call log on his cell phone to show Sergeant Boyd that he called 911 at 1:09 p.m. and offered his phone to Sergeant Boyd. At multiple times during the interaction with Sergeant Boyd, Diallo expressed concern about getting food for the children that he had ordered from a nearby restaurant.

{¶ 8} When Sergeant Boyd asked where Diallo was earlier in the day, Diallo stated he went to a mechanic's shop for his semi-trailer truck in the morning, and then to a Volvo dealership for service to his personal truck around 11:00 a.m. Diallo stated that he then took his semi-trailer truck to a nearby Thorntons gas station and put $200 in fuel in it. Diallo retrieved a receipt from his wallet with a time stamp of 11:54 a.m. Diallo stated that he dropped the trailer at a nearby location and then went home. Investigators later located Diallo's semi-trailer truck parked in a lot across the street from the nearby Thorntons gas station.

{¶ 9} Detective Tressa Brinkley of the Franklin County Sheriff's Department also interacted with Diallo in his driveway on September 30, 2021. She testified that Diallo was "very calm" and asserted he showed her a receipt from an automated teller machine at the Thorntons gas station reflecting that he had withdrawn money there earlier in the day. (July 17, 2023 Tr. at 563.) Detective Brinkley testified that she helped escort the two children Diallo had removed from the house to be checked by paramedics, and that neither child smelled like smoke or was covered in soot. Officer Brandi Kranz of the Madison Township Police Department similarly testified that Diallo was very calm and did not appear to be concerned about anything but his children. Officer Kranz testified that the two children were "[v]ery clean" and had "no odor of anything," nor any visible soot or markings on them. (July 17, 2023 Tr. at 649.) She found the lack of any odor of smoke or soot markings to be odd because Diallo had told other responders that when he arrived home he found the children in a room full of smoke.

{¶ 10} There was a Ring camera located beside the door of Diallo's home, and Diallo voluntarily provided the video files from that camera to investigators.[2] Four videos taken from Diallo's Ring camera were played for the jury. In the first video, Diallo can be seen opening the door to his home at 12:24 p.m. In the second video, at 1:02 p.m., Diallo can be seen walking away from the door carrying a child to his Toyota Tacoma truck and then opening and closing the doors on the driver's side of the truck. In the third video, at 1:08 p.m., Diallo again can be seen walking away from the door, carrying one child (who appears to be the same child he was carrying in the second video) and leading another child to the

---

[2] Diallo also informed investigators that there were Blink cameras on the front exterior of the home, but the investigation revealed those cameras had not recorded any video footage on September 30, 2021.

truck.  In the fourth video, at 1:09 p.m., Diallo can be seen walking away from the door without either of the children; he closes the door behind him and appears to be talking on his cell phone while walking toward his truck.  There is no smoke visible in the videos taken from Diallo's Ring camera.  Other than the first video, none of the videos from Diallo's Ring camera show him approaching or entering the house.

{¶ 11} Investigators also obtained video from a Ring camera located on a house across the street and a few lots away from the Diallo home.  A digitally enhanced video and still images taken from that camera were presented to the jury.  In the video, Diallo's Toyota Tacoma truck can be seen pulling into the driveway at 12:22 p.m.  Consistent with the videos retrieved from Diallo's Ring camera, a person can be seen entering the home at 12:24 p.m.  The person then can be seen exiting the home at 1:02 p.m., walking to the truck, and then returning to the house.  The person also can be seen exiting the Diallo home at 1:08 p.m. and walking to the truck.  The person appears to walk back to the house at 1:09 p.m., close the door, and return toward the truck.  The person then can be seen walking around in the area in front of the truck and along the front of the house.  Beginning around 1:11 p.m., smoke can be seen emerging from the house.  At 1:12 p.m., the person appears to exit the truck and return toward the house again, walks back and forth to the truck and walks around in the area in front of the house, and then returns to the truck.  Although from our review of the video we cannot tell where the person was looking, a fire marshal's investigator testified that the person appeared to be "peering in the front window" into the room where Fatoumata's body was found.  (July 14, 2023 Tr. at 395.)  At 1:14 p.m., the truck pulls slightly forward in the driveway.  At 1:16 p.m., the person can again be seen walking in the driveway area, away from the house and toward the truck.  The first fire engine enters the video at 1:16 p.m., and other emergency vehicles begin arriving by 1:18 p.m.

{¶ 12} A shirt that appeared to match the one Diallo was wearing in the Ring camera videos was later recovered during a search of his Toyota Tacoma truck.  The shirt tested negative for the presence of ignitable liquid, but a stain on the front of the shirt tested presumptively positive for the presence of blood.  The apparent blood stain contained a mixture of DNA consistent with samples taken from Diallo and from Fatoumata.  The analyst who performed the testing admitted on cross-examination that DNA could be present on the shirt because it had been worn or touched.  Although the analyst could not

confirm whether the blood stain was from Diallo or Fatoumata, she testified it was "highly unlikely" that it did not come from at least one of them. (July 17, 2023 Tr. at 551.)

{¶ 13} When Fatoumata's body was moved, a partially burned bottle of Kingsford charcoal lighter fluid was found under her pelvic area. As part of the investigation, a trained dog was taken through the interior and portions of the exterior of the home. The dog signaled the possible presence of ignitable liquids on the carpet near Fatoumata's body. Samples taken from those areas of carpet tested positive for a "medium petroleum distillate," which is a category that can include lighter fluid. An investigator from the State Fire Marshal's Office ultimately determined that the fire originated in the seating area of a sofa on the south wall of the room where Fatoumata's body was found. Her body was on the floor near the sofa, with her upper body closer to the sofa and her legs extending toward the middle of the room. The investigator testified that the fire was classified as an incendiary fire caused by a human act with the use of ignitable liquids.

{¶ 14} Investigators were unable to determine where the bottle of lighter fluid found under Fatoumata's body had been purchased. Using the lot number printed on the bottle, they contacted the manufacturer and determined that it was part of a lot shipped to central Ohio, but the manufacturer could not identify a specific store. Although they could not find a specific store for that lot number, investigators found that the same brand of lighter fluid was sold at the Thorntons gas station near the Diallo home. After reviewing videos from the gas station, investigators determined that a black man had purchased the same type of lighter fluid there on September 18, 2021, but determined it was not Diallo and did not investigate that individual further.

{¶ 15} A forensic pathologist determined the causes of Fatoumata's death to be ligature strangulation and thermal burns. He testified that the location of the cable around Fatoumata's neck and the placement of the knot were consistent with the cable having been placed there by another person, and that they were not consistent with suspension or suicide by hanging. He also stated that there was soot in Fatoumata's airway, which was consistent with inhalation of smoke and the products of combustion. The pathologist testified that the condition of the skin under the cable indicated it was placed around Fatoumata's neck before her body was burned, and that the condition of less-burned areas on the back were consistent with her body lying on the floor when the burning occurred.

He stated that the burns Fatoumata suffered would not have been survivable based on the amount of tissue damage sustained. He asserted that the strangulation and burns occurred in close proximity to each other and therefore could not be separated as to a single cause of death.

{¶ 16} Diallo's trial counsel did not call any witnesses and Diallo elected not to testify in his own defense.

{¶ 17} The jury found Diallo guilty on all charges contained in the indictment. The trial court conducted a sentencing hearing on July 26, 2023. The court found that the two murder convictions merged for purposes of sentencing. The court imposed a sentence of 15 years to life imprisonment on the murder conviction, an indeterminate term of 8 to 12 years of imprisonment on aggravated arson conviction, 36 months of imprisonment on the tampering with evidence conviction, and 12 months of imprisonment on the abuse of a corpse conviction. The court found that consecutive sentences were necessary and imposed all sentences consecutively, for a total minimum term of 27 years to life imprisonment and a potential maximum term of 31 years to life imprisonment.

## II. Assignments of Error

{¶ 18} Diallo appeals and assigns the following four assignments of error for our review:

> [I.] THE JURY VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [II.] APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL.
>
> [III.] THE TRIAL COURT ERRED IN INSTRUCTING THE JURY.
>
> [IV.] THE TRIAL COURT ERRED IN SENTENCING APPELLANT BY MAKING FACTUAL FINDINGS THAT WERE NOT SUPPORTED BY THE RECORD.

## III. Analysis

### A. Weight and sufficiency of the evidence

{¶ 19} In his first assignment of error, Diallo asserts the jury's verdicts were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 20} "Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 2010-Ohio-1881, ¶ 36 (10th Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 23. When reviewing a challenge to the sufficiency of the evidence, we must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 1997-Ohio-355, ¶ 49, fn. 4. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.*

{¶ 21} While a sufficiency-of-the-evidence challenge requires a determination of whether the evidence is legally sufficient to support the verdict as a matter of law, a manifest-weight challenge "addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38. When reviewing the weight of the evidence, we "may not merely substitute [our] view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. McCrary*, 2011-Ohio-3161, ¶ 12.

{¶ 22} On appeal, Diallo does not challenge the evidence supporting the jury's conclusions that the offenses occurred. Rather, his arguments go to the issue of identity, asserting the state failed to establish that he was the person who committed the offenses. Diallo asserts there was no direct evidence or physical evidence to establish that he committed the offenses and claims the state's case was based solely on circumstantial evidence. With respect to the lack of direct evidence, " '[t]he identity of a perpetrator may be established by the use of direct *or* circumstantial evidence.' " (Emphasis added.) *State v. Aekins*, 2023-Ohio-322, ¶ 79 (10th Dist.), quoting *State v. Mickens*, 2009-Ohio-1973, ¶ 18 (10th Dist.). *See State v. Jackson*, 57 Ohio St.3d 29, 38 (1991) ("[D]irect evidence of a fact is not required, and circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence. . . . Even murder convictions can rest solely on circumstantial evidence."). Further, although there was no direct physical evidence

establishing that Diallo committed the offenses, there was the blood stain on shirt recovered from the Toyota Tacoma, which appeared to be the shirt Diallo was wearing when he arrived home and when he escorted the children out of the home. The stain contained a mixture of Diallo's DNA and Fatoumata's DNA and the forensic pathologist testified it was highly unlikely that it was not blood from at least one of them.

{¶ 23} Diallo also argues his behavior was inconsistent with someone who had committed such crimes, arguing that he cooperated with the investigation, including voluntarily offering his cell phone to Sergeant Boyd and assisting with retrieval of his Ring camera videos. He claims the state offered no explanation of why he would kill his wife, asserting there was no evidence of any arguments or disagreements in the time before Fatoumata's death. He acknowledges that he and his wife had filed for divorce three years earlier, but notes that he later voluntarily dismissed his petition. However, the state is not required to prove motive to secure a conviction. *State v. Ingram*, 2007-Ohio-7136, ¶ 55 (10th Dist.). *See State v. Curry*, 43 Ohio St.2d 66, 70-71 (1975) ("Since it is assumed that human conduct is prompted by a desire to achieve a specific result, the question of motive is generally relevant in all criminal trials, even though the prosecution need not prove motive in order to secure a conviction."); *State v. Lancaster*, 167 Ohio St. 391 (1958), paragraph two of syllabus ("Motive is not an element of the crime of murder and need not be established to warrant a conviction; proof of motive does not establish guilt, nor does want of proof thereof establish innocence; and, where the guilt of the accused is shown beyond a reasonable doubt, it is immaterial what the motive may have been for the crime, or whether any motive is shown."); *State v. Williams*, 2024-Ohio-5164, ¶ 75 (11th Dist.) ("[T]he state is not required to prove motive to meet its burden of production in a prosecution."); *State v. Williams*, 2021-Ohio-443, ¶ 26 (5th Dist.) ("Motive is not an element of either murder or felonious assault, and the State was not required to prove motive.").

{¶ 24} The state's evidence established that Diallo entered his home at 12:24 p.m. Almost 40 minutes passed before he began removing the children from the house, and he did not call 911 until 1:09 p.m., which was 45 minutes after he first entered the house. In the Ring camera videos, Diallo can be seen removing the children from the house, but his actions do not appear particularly hurried. After removing the first child from the house,

he returned into the house carrying that child, presumably to retrieve the second child. After placing the children in his truck, Diallo walks back to the house and closes the door without attempting to re-enter, apparently at the same time he was calling 911. No smoke was visible in the Ring camera videos from the Diallo house as Diallo and the children were exiting. In the Ring camera video obtained from a house down the street, smoke does not appear until two minutes after Diallo exited the house for the last time. Two investigators testified that the children did not smell of smoke and did not appear to have soot markings on them. Thus, the evidence is inconsistent with a scenario where Diallo arrived home to find the children in a smoke-filled house and immediately rushed them out. Additionally, the injuries to Fatoumata's body established that her death was caused by another person. The placement of the cable wrapped around and tied behind her neck was consistent with it having been applied by another person before her body was burned. The burns on her body were consistent with her lying on her back on the floor when the fire began. The evidence of smoke inhalation indicated Fatoumata was still breathing at some point after the fire began. There was no evidence of broken doors or broken windows when the first fire engine arrived and no evidence to suggest that some other person entered the Diallo home and committed the offenses. Finally, in addition to the testimony from first responders about Diallo's calm behavior, the jury was also able to assess Diallo's demeanor when interacting with Sergeant Boyd, as seen in the body camera videos.

{¶ 25} Viewed a light most favorable to the prosecution, we conclude that the evidence presented at trial was sufficient to support the jury's verdicts because a rational trier of fact could have concluded that Diallo committed the offenses. Further, based on our review of the evidence presented at trial and all reasonable inferences arising from that evidence, we cannot conclude that the jury clearly lost its way in concluding that Diallo committed the offenses. Therefore, the jury's verdicts are not against the manifest weight of the evidence.

{¶ 26} Accordingly, we overrule Diallo's first assignment of error.

### B. Ineffective assistance of counsel

{¶ 27} In his second assignment of error, Diallo asserts his trial counsel provided ineffective assistance by failing to subpoena any witnesses to testify in his defense and by advising Diallo not to testify at trial. Diallo argues that family and friends who were with

him at the scene of the fire could have testified regarding his demeanor and whether his children's clothes were changed before coming into contact with the state's witnesses. He further argues that his trial counsel should have advised him to testify at trial to explain his actions that could be seen in the Ring camera videos and his statements to law enforcement, and to clarify the nature of his relationship with his wife at the time of the fire.

**{¶ 28}** We apply a two-part standard when evaluating claims of ineffective assistance of counsel. *State v. Rhoades*, 2020-Ohio-2688, ¶ 42 (10th Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984) and *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989). First, a defendant must establish that counsel's performance was deficient. *Id*. Second, a defendant must show that the deficient performance prejudiced his defense–i.e., that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. An attorney licensed in Ohio is generally presumed to be competent and trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *Id*. at ¶ 43.

**{¶ 29}** With respect to Diallo's claim that his trial counsel provided ineffective assistance by failing to call certain witnesses, the decision whether to call a witness is generally a matter of trial strategy that will not be second-guessed on review. *State v. Smith*, 2021-Ohio-1936, ¶ 31 (10th Dist.). Moreover, although Diallo asserts that unspecified family members or friends may have provided testimony to help explain his demeanor at the scene or other details, there is nothing in the record on appeal establishing the identity of these potential witnesses or any information regarding their potential testimony. Determining whether Diallo's trial counsel performed deficiently by failing to call these potential witnesses or whether Diallo was prejudiced by the failure to present their testimony would require consideration of matters outside of the record on appeal.[3] Therefore, we cannot determine in this direct appeal that Diallo's trial counsel provided ineffective assistance by failing to obtain testimony from these witnesses. *See State v. Kennard*, 2016-Ohio-2811, ¶ 26 (10th Dist.) ("Even if appellant was able to demonstrate that his trial counsel erred by failing to identify and subpoena witnesses, a determination

---

[3] In his appellate brief, Diallo concedes that on direct appeal he is limited to issues contained in the record but fails to cite any evidence in the record to support his ineffective assistance of counsel claim.

of appellant's claim of ineffective assistance of counsel would require evidence outside the record to establish that counsel's inaction prejudiced appellant."); *State v. Washington*, 2007-Ohio-3212, ¶ 28 (10th Dist.) ("Because a determination of these two claims of ineffective assistance of counsel involve facts outside the record, appellant's argument concerning trial counsel's failure to call other alleged witnesses and an expert witness must fail."); *State v. Davis*, 2006-Ohio-5039, ¶ 19 (10th Dist.) ("When allegations of ineffective assistance of counsel hinge on facts not appearing in the record, the proper remedy is a petition for post-conviction relief rather than a direct appeal.").

{¶ 30} Similarly, Diallo's claim that his trial counsel provided ineffective assistance by not advising him to testify at trial relies on matters outside the record in this appeal. The only evidence in the record relating to Diallo's decision not to testify indicates that his trial counsel discussed Diallo's rights with him but does not reveal any specific advice regarding whether to testify. When the trial court asked Diallo's trial counsel about any discussions regarding whether Diallo would testify, trial counsel responded:

> At this time, thank you, I've discussed with Mr. Diallo again the rights that he has to testify and to not testify. He understand[s] he has the right to. He has chosen not to testify in this matter. Thank you.

(July 18, 2023 Tr. at 697.) Although this response clearly indicates that Diallo and his trial counsel discussed whether Diallo should testify, the record does not contain any information about advice Diallo's trial counsel may have given regarding that decision. Absent such information, we cannot conclude that Diallo's trial counsel performed deficiently when advising Diallo about whether to testify. *See Rhoades* at ¶ 44 ("Because a claim of ineffective assistance of counsel arising from any advice Rhoades' trial counsel may have given about whether to testify relies on matters outside the record, such a claim would not be appropriate on direct appeal.").

{¶ 31} Accordingly, we overrule Diallo's second assignment of error.

## C. Jury instructions

{¶ 32} Diallo's third assignment of error asserts the trial court erred in instructing the jury. As part of the jury instructions, the trial court delivered the following charge:

> You must not discuss or consider the subject of punishment. Your duty is confined to the determination of the guilt or the innocence of the defendant. In the event you find the

> defendant guilty, the duty to determine the punishment is placed by law upon the Court.

(July 18, 2023 Tr. at 796.)  Diallo argues this instruction was improper because the jury's duty was to determine whether the state had proved all essential elements of each offense beyond a reasonable doubt.  Diallo asserts that if the jury found the state failed to meet that burden as to one or more elements of an offense it was required to find him not guilty, and that the jury was not required to find him "innocent" to return a not guilty verdict.  Diallo admits his trial counsel did not object to this instruction at trial but argues it constituted structural error affecting the framework of the trial or, at a minimum, was not a harmless error.

{¶ 33}  Under Crim.R. 30(A), objections to jury instructions must be made before the jury retires to consider its verdict; failure to comply with this requirement waives all but plain error.  *State v. Robinson*, 2021-Ohio-3496, ¶ 45 (10th Dist.).  "In order to demonstrate plain error, the defendant must show: (1) an error that is plain on the record, i.e., a deviation from a legal rule that constitutes an obvious defect in the trial proceedings; and (2) that such error affected substantial rights, i.e., there was a reasonable probability that the error affected the outcome of the trial."  *State v. Barrie*, 2016-Ohio-5640, ¶ 32 (10th Dist.).

{¶ 34}  When considering an alleged error in a jury instruction, " 'a reviewing court must consider the jury charge as a whole and "must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." ' "  *State v. Wilks*, 2018-Ohio-1562, ¶ 115, quoting *Kokitka v. Ford Motor Co.*, 1995-Ohio-84, 73 Ohio St.3d 89, 93, quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208 (1990).  In this case, the trial court repeatedly instructed the jury that the state had the burden of proof to establish every element of each offense beyond a reasonable doubt.  In the third paragraph of the jury instructions, the trial court generally explained the state's burden of proof:

> The defendant is presumed innocent unless guilt is established beyond a reasonable doubt.  The defendant must be acquitted of an offense unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense.

(July 18, 2023 Tr. at 782.) The trial court subsequently reiterated the state's burden of proof with respect to the specific element of identity:

> The burden of proof on the prosecutor extend[s] to every element of the crime charged and includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged. If after examining the evidence, you have a reasonable doubt as to the accuracy of the identification you must find the defendant not guilty.

(July 18, 2023 Tr. at 786.) The trial court also reiterated the state's burden of proof with respect to each specific charge in the indictment.

{¶ 35} Under similar circumstances, the Supreme Court of Ohio has rejected a challenge to a nearly identical reference to "guilt or innocence" in a jury instruction. *State v. Diar*, 2008-Ohio-6266, ¶ 123-26. The *Diar* decision rejected the defendant's claim that the instruction effectively shifted the burden of proof, noting that the trial court had already instructed the jury that the state bore the burden of proof as to the elements of each offense and that acquittal was required if the state failed to meet that burden. *Id.* at ¶ 126. The court concluded that "[n]o reasonable juror would have believed that this incidental reference to 'guilt or innocence' shifted the state's burden of proof to the accused." *Id. See State v. Coley*, 2001-Ohio-1340, ¶ 77-80; *State v. Jones*, 2001-Ohio-57, ¶ 57 ("Any reasonable juror would have taken the instruction [that the jury was confined to the determination of the guilt or innocence of the defendant] as nothing more than a warning not to consider punishment during the guilt phase.").

{¶ 36} Consistent with the reasoning in *Diar*, we conclude the trial court did not commit plain error by referring to determination of Diallo's guilt or innocence in the jury instructions when admonishing the jury not to consider the issue of punishment. The trial court had repeatedly instructed the jury on the state's burden to prove every element of the offenses beyond a reasonable doubt, and the incidental reference to innocence was unlikely to mislead the jury as to the burden of proof.

{¶ 37} Accordingly, we overrule Diallo's third assignment of error.

### D. Error in consecutive-sentence findings

{¶ 38} In his fourth assignment of error, Diallo asserts the trial court erred by imposing consecutive sentences based on findings that were not supported by the record.

The sentencing entry included findings that Diallo committed one or more of the offenses while he was awaiting trial or sentencing or was under post-release control for a prior offense, and that consecutive sentences were necessary to protect the public based on a history of criminal conduct. Diallo argues that nothing in the record established he was awaiting trial, sentence, or was otherwise under supervision at the time of the offenses or that he had a history of criminal conduct, and that a resentencing hearing is necessary to correct these errors in the sentencing entry. The state concedes the trial court did not make those findings at the sentencing hearing and that they were erroneously included in the sentencing entry. The state asserts that a resentencing hearing is unnecessary, however, because the trial court made other consecutive-sentence findings at the sentencing hearing. The state argues the trial court can correct the error in the sentencing entry through a nunc pro tunc entry.

{¶ 39} Generally, under Ohio law there is a presumption that multiple terms of imprisonment will be imposed concurrently. *See* R.C. 2929.41(A) ("Except as provided in [R.C. 2929.41(B), 2929.14(C), or 2971.03(D) or (E)], a prison term, jail term, or sentence of imprisonment shall be served concurrently with any other prison term, jail term, or sentence of imprisonment imposed by a court of this state, another state, or the United States."); *State v. Sergent*, 2016-Ohio-2696, ¶ 16 ("Under Ohio law, absent an order requiring sentences to be served consecutively, terms of incarceration are to be served concurrently."). Notwithstanding that presumption, a trial court may impose consecutive sentences if it makes specific findings, as set forth in R.C. 2929.14(C)(4), related to the necessity of consecutive sentences:

> (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16,

2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a) through (c). The trial court must make these findings at the sentencing hearing and incorporate the findings into the sentencing entry but is not required to state reasons to support its findings. *State v. Bonnell*, 2014-Ohio-3177, ¶ 37. On review, if we can "discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶ 29. Under R.C. 2953.08(G)(2), we may "increase, reduce, or otherwise modify a sentence . . . or may vacate the sentence and remand the matter to the sentencing court for resentencing" if we clearly and convincingly find that the record does not support the sentencing court's findings under R.C. 2929.14(C)(4) or the sentence is otherwise contrary to law. *State v. Hoy*, 2024-Ohio-1555, ¶ 10 (10th Dist.).

{¶ 40} At the sentencing hearing, the trial court asserted that "[t]he evidence absolutely supported [a finding of] you murdering your wife and then setting her on fire" and declared "[t]he fact that the evidence in the record indicates that she was still alive at the time she was set on fire indicates to the Court an absolute level of malice and hatred." (July 26, 2023 Tr. at 15.) The trial court further declared it to be "one of the worst situations and facts that I have seen in my 17 years on this bench." (July 26, 2023 Tr. at 15.) The trial court then made the following findings with respect to consecutive sentences:

Counts 1, 3, 4, and 5 shall run consecutive to each other as the Court finds that consecutive sentences are necessary to protect the public from future crime and to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public.

> Court finds that at least two of the multiple offenses were committed as part of one or more course[s] of conduct and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflect the seriousness of the offender's conduct.

(July 26, 2023 Tr. at 16-17.) The sentencing hearing transcript reflects that, with respect to the third required finding, the trial court found that consecutive sentences were appropriate because R.C. 2929.14(C)(4)(b) applied.

{¶ 41} The sentencing entry included the following findings with respect to consecutive sentences:

> After reviewing R.C. 2929.14(C), the Court finds that a consecutive sentence is necessary to protect the public from future crime, to punish the offender and that a consecutive sentence is not disproportionate to the seriousness of the offenders conduct and to the danger the offender poses to the public.
>
> Also, the Court finds the offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing or was under sanction pursuant to section 2929.16, 2929.17 or 2929.18 of the Revised Code or was under post release control for a prior offense
>
> Also, the court finds at least two of the multiple offenses were committed as part of one or more course of conduct, and the harm caused was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct
>
> The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crimes by the offender

(Aug. 4, 2023 Jgmt. Entry at 3.) The sentencing entry reflects the trial court's finding that consecutive sentences were appropriate under R.C. 2929.14(C)(4)(b), but also contains findings that were not made on the record at the sentencing hearing, i.e., that consecutive sentences were appropriate under R.C. 2929.14(C)(4)(a) and (c). Thus, there is a discrepancy between the consecutive-sentence findings made on the record at the

sentencing hearing and the consecutive-sentence findings contained in the sentencing entry.

{¶ 42} The Supreme Court of Ohio has held that "[a] trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law" and that "such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *Bonnell*, 2014-Ohio-3177, at ¶ 30. "But a nunc pro tunc entry cannot cure the failure to make the required findings at the time of imposing sentence." *Id.* This court likewise has held that omission of required consecutive-sentence findings from a judgment entry does not render consecutive sentences contrary to law when the trial court made those findings during the sentencing hearing, and that a nunc pro tunc entry may be used to correct the judgment entry to reflect the findings made at the sentencing hearing. *State v. Frost*, 2023-Ohio-3637, ¶ 8 (10th Dist.); *State v. Montgomery*, 2015-Ohio-3255, ¶ 22 (10th Dist.).

{¶ 43} The sentencing entry in this case includes the consecutive-sentence finding the trial court made at the sentencing hearing. It also includes consecutive-sentence findings that were not made at the sentencing hearing, and which do not appear to be supported by the record. In a similar case, the Third District Court of Appeals held that a discrepancy between the consecutive-sentencing finding made at a sentencing hearing and the consecutive-sentence finding included in a sentencing entry did not require a full resentencing hearing and could be corrected by a nunc pro tunc entry. *State v. Palmer*, 2023-Ohio-2719, ¶ 15 (3d Dist.). In *Palmer*, the trial court made a finding under R.C. 2929.14(C)(4)(c) at the sentencing hearing, concluding that the defendant's history of criminal conduct demonstrated that consecutive sentences were necessary to protect the public. *Id.* at ¶ 12. The sentencing entry, however, included a finding under R.C. 2929.14(C)(4)(b), relating to multiple offenses committed as part of a single course of conduct and harm so great or unusual that no single prison term adequately reflected the seriousness of the conduct. *Id.* at ¶ 13. Although the sentencing entry did not reflect the finding made at the sentencing hearing, the appellate court concluded that the sentencing hearing transcript established the trial court made the necessary consecutive-sentence finding at the sentencing hearing. *Id.* at ¶ 14. Therefore, the discrepancy between the

finding made at the sentencing hearing and the finding recorded in the sentencing entry was a clerical error that could be corrected through a nunc pro tunc entry. *Id*. at ¶ 14-15.

{¶ 44} The Twelfth District Court of Appeals also has declined to find reversible error in a similar case where there was a discrepancy between the consecutive-sentence findings made at a sentencing hearing and those included in a sentencing entry. *State v. Writesel*, 2017-Ohio-8795, ¶ 16-17 (12th Dist.). In *Writesel*, the trial court made findings under R.C. 2929.14(C)(4)(a) and (c) at the sentencing hearing, but the court's sentencing entry included findings under R.C. 2929.14(C)(4)(b) and (c). *Id*. at ¶ 16. Notwithstanding the inclusion of a finding in the entry that the trial court did not make at the sentencing hearing, the appellate court concluded that "a trial court need only make *one* of the [statutory] findings . . . and the trial court made a finding under R.C. 2929.14(C)(4)(c) both at the sentencing hearing and in the sentencing entry." (Emphasis added.) *Id*. The court found no error in imposing consecutive sentences. *Id*. at ¶ 17.

{¶ 45} We agree with the reasoning applied in *Palmer* and *Writesel*. Based on our review of the record in this case, we can "discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings," and therefore we conclude that the imposition of consecutive sentences in this case was not contrary to law. *Bonnell*, 2014-Ohio-3177, at ¶ 29. The trial court made the necessary consecutive-sentence findings at the sentencing hearing, but the sentencing entry does not accurately reflect the consecutive-sentence findings made at the sentencing hearing. The inclusion of consecutive-sentence findings in the sentencing entry that were not made at the sentencing hearing was a clerical error that may be corrected by a nunc pro tunc entry.

{¶ 46} Accordingly, we sustain Diallo's fourth assignment of error to the extent it asserts the sentencing entry erroneously includes findings under R.C. 2929.14(C)(4)(a) and (c) but overrule the fourth assignment of error to the extent it argues that a resentencing hearing is necessary to correct that error. As explained above, the clerical error contained in the sentencing entry may be corrected by a nunc pro tunc entry and we will remand to the trial court for that limited purpose.

## IV. Conclusion

{¶ 47} For the foregoing reasons, we overrule Diallo's first, second, and third assignments of error. We sustain Diallo's fourth assignment of error to the extent it notes

an error in the consecutive-sentence findings in the sentencing entry, but overrule it to the extent it asserts a resentencing hearing is necessary to correct that error.  We affirm the judgment of the Franklin County Court of Common Pleas, but remand the matter to that court for the limited purpose of allowing it to correct the clerical error in the sentencing entry by issuing an appropriate nunc pro tunc entry.

*Judgment affirmed and cause remanded.*

BEATTY BLUNT & BOGGS, JJ., concur.