[Cite as *State v. Diallo*, 2026-Ohio-2053.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 25AP-616 |
| | | (C.P.C. No. 21CR-4188) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Mamadou Aliou Diallo, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 2, 2026

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Benjamin A. Tracy*, for appellee. **Argued:** *Benjamin A. Tracy.*

**On brief:** *Steven P. Billing*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

DINGUS, J.

{¶ 1} Defendant-appellant, Mamadou Aliou Diallo, appeals a judgment of the Franklin County Court of Common Pleas denying his postconviction petition without a hearing. For the reasons that follow, we affirm.

**I. Facts and Procedural History**

{¶ 2} In 2023, a jury found Diallo guilty of two counts of murder and one count each of aggravated arson, tampering with evidence, and abuse of a corpse. The charges arose from the death of Diallo's wife, Fatoumata Diallo ("Fatoumata"), at their home on September 30, 2021. Diallo appealed, and this court affirmed his convictions in *State v. Diallo*, 2025-Ohio-920 (10th Dist.). We confirmed our decision after allowing Diallo to reopen his appeal and present an ineffective-assistance claim related to his speedy-trial

rights. *State v. Diallo*, 2025-Ohio-5812 (10th Dist.). During the process of his direct appeal and his reopened appeal with this court, Diallo sought postconviction relief. The postconviction claims relevant to the current appeal were centered on two evidentiary matters: (1) alleged recordings from Diallo's Blink home security cameras, and (2) the trial testimony of the retired Madison Township Fire Department Battalion Chief, Robert Schneider.

### A. Trial Proceedings

{¶ 3}   At trial, plaintiff-appellee, State of Ohio, introduced evidence that Fatoumata died from ligature strangulation and thermal burns. Firefighters found her body, along with a can of lighter fluid, in the basement family room of the Diallos' home. Fatoumata was lying supine on the floor with a knotted cord wrapped tightly around her neck. The positioning of her body and presence of accelerant indicated that her death was not accidental, and the lack of any slanting to the ligature indicated that her death was not suicide.

{¶ 4}   Firefighters had come to the Diallos' home shortly after Diallo called 9-1-1 at 1:09 p.m. Diallo told first responders that at about 1:00 p.m., he had arrived home and found the house on fire. However, footage from Diallo's Ring doorbell camera and a neighbor's camera showed that Diallo arrived home around 12:22 p.m. Diallo told the 9-1-1 operator that he had gotten the children out of the house but could not get back in. He told the police he had taken the children from a smoke-filled room. However, the children did not smell of smoke, and footage from Diallo's Ring doorbell camera and a neighbor's camera showed Diallo repeatedly coming out the front door of his home with the children from 1:02 to 1:08 p.m. without any air of urgency and no smoke apparent. At 1:09 p.m., after placing the two children in a truck, Diallo walked back up to the house, closed the front door, and walked away.

{¶ 5}   Robert Schneider, the battalion chief for the local fire department at the time of Fatoumata's death, testified that he came to the scene of the fire shortly after the first fire crew and first rescue team arrived. He testified that he heard someone on his radio say that "they had an all clear on the scene per the homeowner," meaning that there were no other occupants who needed to be evacuated. (July 13, 2023 Tr. Vol. IV at 249-250.) Chief Schneider further testified that he approached Diallo when he arrived at the scene "because

I like to verify nobody's inside the structure still. And I asked him outright is everybody out of the house. At that point, he said, I got the kids out of the house. They're here. And I said everybody else is out and he said yes." (Tr. at 251.) Chief Schneider testified that after the first responders discovered Fatoumata's body, "I . . . asked him if he realized that somebody else was still inside the house and he did not give me a straight answer at first and looked confused. And then after I asked him a second time he stated to me, it was the kids' mother." (Tr. at 256.) Chief Schneider and various first responders testified that Diallo seemed unconcerned about Fatoumata and described his affect as nonchalant, calm, or relaxed.

{¶ 6} Richard Petrarca, a Franklin County Sheriff's Office detective specializing in digital forensic evidence, testified that he responded to the scene along with homicide detectives after Fatoumata's body was found. Diallo provided his cellphone to Detective Petrarca so that he could view Diallo's home security videos. Diallo allowed him to access the Ring camera application for the doorbell camera, as well as a Blink camera application for two other cameras attached to the front of the house. Detective Petrarca noted a floodlight at the back of the house, which he had initially thought was a third Blink camera. He testified that when he looked through Diallo's Blink account at the scene, "there was nothing recorded on that app the day of the incident. It only recorded something the previous night." (Tr. Vol. VI at 609.) When Detective Petrarca later reviewed the downloaded contents of Diallo's cellphone, there were no videos on the Blink application for September 30, 2021. On cross-examination, Detective Petrarca acknowledged that he did not attempt to recover any additional videos by subpoenaing Ring or Blink.

{¶ 7} During closing arguments, the defense replayed the recording of Diallo's 9-1-1 call and noted that the operator repeatedly interrupted Diallo as he was explaining that he could not get back in the house after taking his children out. The defense noted that Diallo made clear he had tried to get back into the house, which could not have been for any reason other than to retrieve another person. The defense argued that the recording of Diallo's 9-1-1 call contradicted Chief Schneider's testimony, and that Chief Schneider was incorrect in his recollection that Diallo said the house was clear.

{¶ 8} The defense also stressed that Diallo voluntarily handed over all of his Ring and Blink application information and argued that Diallo had nothing to hide. He argued

that because the video evidence was incomplete, there was no way to know if Diallo had been the only person in the house who could have set the fire. He argued that the state did not seek additional evidence from Ring or Blink because they had unfairly pegged Diallo as the perpetrator from the start.

### B. Appellate Proceedings

{¶ 9} In his direct appeal, Diallo challenged the weight and sufficiency of the state's evidence. *Diallo*, 2025-Ohio-920 (10th Dist.). Diallo noted that, among various other alleged evidentiary deficiencies, there were no recordings from his Blink cameras and no video of the rear of his house. This court overruled his manifest weight and sufficiency arguments, as well as arguments regarding ineffective assistance of counsel and jury instructions. *Id.* at ¶ 47. We ordered a limited remand for a nunc pro tunc entry to correct a consecutive-sentencing issue and otherwise affirmed. *Id.*

{¶ 10} In his reopened appeal, Diallo asserted that his speedy-trial rights had been violated and that trial counsel had been ineffective for failing to properly raise the issue. *Diallo*, 2025-Ohio-5812, at ¶ 5 (10th Dist.). Diallo argued that his extended pretrial incarceration left him unable to review his Blink video recordings, which he alleged were accessible on his cellphone, via email, or from local storage on the cameras themselves. He argued that there was a third Blink camera at the back of his house, footage from which would have supported an unspecified alibi. This court rejected Diallo's argument, noting that the defense conceded during a pretrial conference that the state had provided all of the information from Diallo's cellphone during discovery, and that Diallo was aware that there were no Blink videos from the day of the fire. *Id.* at ¶ 24, fn. 5.

### C. Postconviction Proceedings

{¶ 11} While Diallo's direct appeal and reopened appeal with this court were pending, he filed a piecemeal petition for postconviction relief with the trial court. Diallo asserted six claims for postconviction relief, three of which are relevant to the present appeal: (1) the state concealed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) the state destroyed the concealed evidence in bad faith, violating *Arizona v. Youngblood*, 488 U.S. 51 (1988); and (3) the state knowingly elicited false testimony from a trial witness in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and

*State v. Iacona*, 2001-Ohio-1292.[1] Specifically, he asserted that there had been a third Blink camera at the back of his house and that the state withheld and destroyed the recordings from that camera. He asserted that Chief Schneider lied when he testified that Diallo told him that no one was left in the house, and that the state was aware that the testimony was false.

{¶ 12} Diallo included the following materials to support his claims:

- An October 6, 2021 witness statement from a firetruck driver, who indicated that he yelled to the crew that there might be someone else in the house after Diallo "said something about a mother I thought." (Apr. 28, 2025 Mot. for Leave to Amend Petition to Set Aside or Vacate a Conviction Pursuant to R.C. 2953.21, Ex. 3 at 1.)

- One page from a sheriff sergeant's October 6, 2021 investigation report, which indicated that he arrived at the scene at 2:30 p.m. on September 30, 2021 and heard from an unidentified source that Diallo initially told first responders that he had gotten the children out of the house, and that he could not go back inside to get his wife because the smoke was too bad.

- A detective's November 18, 2021 investigation report, which indicated that the detective arrived at the scene at 2:20 p.m. on September 30, 2021 and talked to Chief Schneider and a fire investigator, one or both of whom said that unidentified first responders told them that Diallo disclosed that his wife was still in the house. The police chief said that Diallo told first responders that he had gotten the children out of the house, and that he could not go back inside to get his wife because the smoke was too bad.

- Pictures of the back of Diallo's house, which showed a small, latched access panel to a crawl space at the base of the house and a dark object mounted on the wall. Diallo asserted that the object was a camera, though he later conceded that it was a broken floodlight.

---

[1] Diallo additionally claimed that (4) his trial counsel had been ineffective for failing to consult with a forensic pathologist regarding Fatoumata's time of death, (5) trial counsel had been ineffective for failing to conduct forensic testing that might have shown that Fatoumata smoked cigarettes, and (6) the trial court violated Diallo's due-process rights by appointing an interpreter that spoke the Senegal dialect of Fulani when Diallo spoke the Guinea dialect of Fulani. Diallo does not address these additional claims in his assignments of error on appeal, and we therefore do not take them into consideration in our analysis.

- An affidavit from Diallo, in which he stated that there was smoke in the house when he arrived, he went out the back door and retrieved the children from the crawl space, and he took them to the front of the house. He stated that "Blink Cameras in the back should have captured him doing this, but the prosecution has suppressed this footage." (Dec. 16, 2024 Aff. of Diallo at 1.)

{¶ 13} The trial court denied Diallo's postconviction petition without holding a hearing. The court indicated that the witness statement and investigation reports would only affect the weight and not the truth or honesty of Chief Schneider's testimony. The court also pointed out that the Ring camera video decisively contradicted Diallo's claim that he tried to reenter the house for Fatoumata but was overwhelmed by smoke. The court held that Diallo failed to provide evidentiary-quality materials to support his claim about the third, backyard Blink camera, leaving only a bald allegation—one which Diallo could have but failed to fully litigate at trial.

{¶ 14} Diallo filed a timely notice of appeal, and the matter is now before this court.

## II. Assignments of Error

{¶ 15} Diallo assigns the following two assignments of error for our review:

> I. Trial court abused its discretion when it denied Petition for Post-Conviction Relief Claim III without a hearing[.]
>
> II. The trial court erred when it denied the Petition for post-conviction Relief Claim I. and II. Without a hearing[.]

(Sic passim.)

## III. Discussion

{¶ 16} A person convicted of a crime may assert a civil, collateral attack of the conviction upon showing that "there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States." R.C. 2953.21(A)(1)(a)(i). For a postconviction petition to merit a hearing, it must demonstrate "substantive grounds for relief." R.C. 2953.21(D). A petition provides substantive grounds for relief if it demonstrates a cognizable claim of constitutional error that depends on factual issues that cannot be resolved by looking at the trial record. *State v. Bunch*, 2022-Ohio-4723, ¶ 23. The evidence attached to a postconviction petition must contain sufficient operative facts to support the alleged error and the claim that the petitioner was prejudiced by the error. *State v. Jackson*, 64 Ohio

St. 2d 107, 111 (1980). "If the record on its face demonstrates that the petitioner is not entitled to relief, then the trial court must dismiss the petition." *Bunch* at ¶ 24, citing R.C. 2953.21(D) and (E).

{¶ 17} In his first assignment of error, Diallo argues that he provided adequate evidence showing that the state knowingly elicited perjured testimony from Chief Schneider. " 'The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Iacona*, 2001-Ohio-1292, at ¶ 60, quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989). The defendant must demonstrate that " '(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false.' " *Id.*, quoting *Lochmondy* at 822. A defendant has the burden "to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Lochmondy* at 822. *See also State v. Monford*, 2012-Ohio-5247, ¶ 17 (10th Dist.); *State v. Buck*, 2017-Ohio-8242, ¶ 76 (1st Dist.); *State v. Rosales*, 2018-Ohio-197, ¶ 15 (2d Dist.); and *State v. Widmer*, 2013-Ohio-62, ¶ 41 (12th Dist.).

{¶ 18} At trial, Chief Schneider testified that he heard over a radio communication that the house was clear per the homeowner. He testified that when he personally spoke to Diallo, Diallo initially stated that no one else was in the house and later agreed that Fatoumata was in the house. The written statements attached to Diallo's postconviction petition are firsthand, secondhand, and thirdhand accounts of what Diallo told one or more first responders at the scene. The attached statements do not include accounts of any statements made on radio transmissions, nor do they include accounts of Diallo's direct conversations with Chief Schneider. Even assuming the attached statements were indeed made, they do not indicate that Chief Schneider's testimony was false or that the state knew it was false. Diallo's postconviction petition, on its face, fails to show that Chief Schneider's testimony was actually perjured, and we therefore overrule his first assignment of error.

{¶ 19} In his second assignment of error, Diallo argues that the state violated his due process rights by withholding or destroying Diallo's Blink camera recordings. He contends that the trial court should have held an evidentiary hearing to determine whether additional recordings exist from his Blink cameras. The state's suppression "of evidence favorable to

an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady*, 373 U.S. at 86. Evidence is "deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Johnston*, 39 Ohio St.3d 48 (1988), paragraph five of the syllabus. An obvious prerequisite to the materiality of evidence is the existence of the evidence in the first place. Mere speculation about the existence of evidence or the content of hypothetical evidence is not sufficient to support a *Brady* claim. *State v. Sullivan*, 2014-Ohio-1260, ¶ 20 (10th Dist.), quoting *State v. Moore*, 2013-Ohio-3365, ¶ 43 (10th Dist.), quoting *State v. Hanna*, 2002-Ohio-2221, ¶ 60 (" 'A *Brady* violation may not rest upon a claim that is "purely speculative." ' ").

{¶ 20} Diallo claims that additional Blink camera recordings must have existed, their absence in discovery necessarily means that the state suppressed or destroyed them, the recordings would have shown Fatoumata putting the children in the crawlspace and Diallo later removing them, and they further would have shown that Diallo retrieved a ladder from the garage to look into the second story windows for Fatoumata. Diallo failed to articulate the last of these claims to the trial court, but regardless, all of Diallo's claims are speculative. The assertion that there might be exculpatory evidence outside the record is not itself evidence outside the record to support a postconviction claim. Accordingly, Diallo failed to present sufficient operative facts to support his *Brady* claim.

{¶ 21} Further, as the trial court noted, Diallo had been in the best position to inform investigators about additional Blink cameras, as they would have been under his control. Diallo allowed Detective Petrarca to access the Blink application on his phone on September 30, 2021. When Detective Petrarca noted that nothing was recorded in the application that day, Diallo did not indicate that additional recordings could be accessed through another means. And as Diallo notes in his brief, he repeatedly raised the issue of missing hypothetical evidence at trial, on appeal, and in his reopened appeal. Without providing some evidence outside the record to substantiate the existence of the hypothetical recordings, Diallo's speculation about the fate of those recordings is an issue that he could have raised and arguably did raise in previous proceedings. His argument, in its current state, is therefore barred by res judicata. *See State v. Lester*, 41 Ohio St.2d 51, 55 (1975) (if a postconviction claim "could have been fully litigated in an appeal, the court can

summarily dismiss the claim as barred by res judicata"). Accordingly, we overrule Diallo's second assignment of error.

## IV. Disposition

{¶ 22} Based on the foregoing, we overrule Diallo's two assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BOGGS, P.J., and EDELSTEIN, J., concur.

———————————